John HICKEY, III, a minor suing by and through John Hickey, II, his father and next friend

v.

INSURANCE COMPANY OF NORTH AMERICA.

Civ. A. No. 5023.

United States District Court
E. D. Tennessee, N. D.

Jan. 26, 1965.

Francis W. Headman, Knoxville, Tenn., for plaintiff.

F. Graham Bartlett, Knoxville, Tenn., for defendant.

## ROBERT L. TAYLOR, Chief Judge.

John Hickey, III, filed this action against the Insurance Company of North America to collect damages for personal injuries sustained by him as a result of a motor vehicle accident that occurred on May 18, 1963 on the main highway that leads from Knoxville to Oak Ridge, Tennessee. The accident occurred in what has been described in this record as the Karns Community of Knox County. The highway runs generally east and west, Oak Ridge being to the west and Knoxville to the east of the point of the accident. At the time of the accident John III had almost reached 12 years of age.

John's father, John Hickey, Jr., purchased an automobile insurance policy from the defendant on September 9, 1962. This policy was in full force and effect at the time of the accident. This policy contained a provision, which is known as the uninsured motorist provision, and which protected him, and also protected John Hickey, III, against injury negligently caused by third parties in the amount of $10,000.00 plus medical expenses to each person. The uninsured motorist provision covered each accident in the amount of $20,000.00.

The suit was instituted to establish contractual liability against the defendant with respect to the uninsured motorist provision in the contract, and also to establish tort liability against Mrs. Hill who admittedly was uninsured at the time of this accident.

The insurance company contends that before this Court could take jurisdiction of the case that John Hickey, III was required to establish legal liability against Mrs. Hill by obtaining a judgment in a court having jurisdiction of the parties.

The parties have stipulated that John Hickey, III is an additional insured under the policy; that the policy in question covers the medical expenses incurred by John Hickey, III, or Dr. John Hickey, Jr., as a result of the injuries sustained by the former in the accident under consideration; that the insurance company has paid all of the medical expenses of $1,-262.61 except $319.54, and the insurance company, through its counsel in open court, announced that it will pay the balance of the medical expenses at a reasonably early date.

At the time the suit was instituted in this court the parties had failed to reach an agreement as to the amount of the damages sustained by John Hickey, III and whether Mrs. Hill was liable for all or any part thereof.

■ The parties stipulated further that the policy provides that in the event the parties are unable to reach an agreed settlement that they shall then arbitrate their differences. Under the Tennessee law there could not be an arbitration because John Hickey, III is a minor under 21 years of age. The policy provisions are silent as to what recourse the parties shall have in the event of failure to reach an agreement and failure to arbitrate.

The uninsured motorist provision is a relatively new type of insurance coverage and resulted, at least in part, because of the concern, or the increasing concern, of the public over injuries caused to innocent citizens by negligent third parties who were either uninsured or financially irresponsible. This provision was designed to "close the gap inherent in motor vehicle financial responsibility and compulsory insurance legislation." The insurance is intended to provide financial recompense to innocent persons who receive injuries and to the dependents of those who are killed through the wrongful conduct of motorists who because they are uninsured and not financially responsible cannot be made to respond in damages within certain limits.

The parties have cited cases involving insurance policies having the uninsured motorist clause, in which the insured party first went into a court and established liability against the uninsured wrongdoer before instituting suit to establish liability against the insurance company. Only one case has been cited in the brief and that by counsel for the defendant in which the injured party was not required to sue the wrongdoer and obtain judgment against him before suing the insurance company.

In that case arbitration could not be had in the State of Arkansas. The insurance policy that was involved was likewise silent as to what course the injured party would have in the event he could not reach a settlement with the insurance company and in the event he was not able to arbitrate for one reason or another. The insurance company in that case made the same contention made here, namely, that the injured party should first be required to obtain judgment against the wrongdoer before proceeding against the insurance company.

The insurance company contended in that case, as here, that it cannot know how much to pay unless and until the amount thereof is established by the judgment in a court of law. That is one of the purposes of this suit, namely, to determine whether or not there is any legal liability against Mrs. Hill, the alleged wrongdoer.

■■ If John Hickey, III has failed to establish legal liability against Mrs. Hill or her husband, one or both, then there can be no liability against the defendant insurance company. But if John Hickey, III can establish legal liability against Mrs. Hill—the driver of the automobile with which he collided, or against her husband, who held the legal title thereto—then this Court, like the Arkansas District Court, can see no reason why he should not be permitted to join the insurance company as defendant in this court.

■ In that connection, the Arkansas Court said:

"Aside from the arbitration clause, I can find nothing in the contract which precludes the plaintiff from bringing this action. In fact, since the insured cannot be made to arbitrate, and the contract suggests that the intention of the parties is to determine the issues between themselves, it appears to the court that the intentions of the parties will best be served by an action in a court of law by the insured against the insurer; the Court, in effect, becomes the arbitrator."

This Court concurs in that view. Wortman v. Safeco Insurance Company of America, D.C., 227 F.Supp. 468, at page 471.

■ Another legal question raised by the insurance company is that the face amount of its policy is $10,000.00 or below the requisite jurisdictional amount.

A short answer to this contention is that the medical expenses which the insurance company contracted to pay to John Hickey, III, the son of the insured, plus the $10,000.00 which is the face amount of the policy, gives the Court jurisdiction of the case since diversity of citizenship exists.

The insurance company says that under the Tennessee law the father is obligated to pay the medical expenses of the minor child, but this rule of law would not preclude John Hickey, III from suing on the contractual liability entered into by the insurance company.

Having disposed of the legal issues involved in the case, we come now to the merits. The merits involve the following issues of fact, as set forth in the pre-trial order: (1) Did Mrs. Hill, or her husband, violate any duty owed to the plaintiff, and if so, was such violation the proximate cause of the accident and resulting injuries? (2) Was plaintiff guilty of proximate contributory negligence that would bar a recovery, and if not guilty of proximate contributory negligence was he guilty of remote contributory negligence that would reduce the damages to which he would otherwise be entitled? (3) In the event plaintiff is entitled to recover, what is the amount?

The issues will be discussed in the order stated. On the date of this accident John Hickey, III was visiting his maternal grandfather and grandmother, Mr. and Mrs. Gamble, who live along what has been described in the record as the Solway Highway which runs from Knoxville to Oak Ridge. Prior to the accident he had been playing hide and seek with his younger brothers and cousins and possibly other children who were visiting his grandmother and grandfather. John decided that he would go across the road from where he had been playing to visit Billy Rice, a young acquaintance, but Billy was not at home. John decided to return to the south side of the highway where his grandfather and grandmother lived and where his grandfather carried on his business.

The highway is shown clearly in Exhibit No. 1 as well as John's grandfather's place of business which is designated as Gamble's Corner.

John testified that he came from the direction of the field which is located on the north side of the road and which is clearly shown in Exhibit No. 5. The highway which he expected to cross was about 22 feet and 7 inches in width with a shoulder made up of rocks with a width of a little less than 8 feet. John traversed the slope adjacent to the shoulder along the road and, when he reached the top of the slope, he stopped and looked to his left where he saw a station wagon traveling from the direction of Knoxville toward Oak Ridge. He stopped for about five seconds so as to give the station wagon time to get out of the way before crossing the road. He looked to his left and observed a truck coming but he decided that he would have time to beat the truck across the highway. He does not remember whether he looked to his right. If he had looked to his right he would have, or should have, seen Mrs. Hill coming in her 1955 Cadillac automobile. Believing that he could reach the south side of the road in safety, he started trotting across the highway and when he reached a point which he believes was near the center, he was struck and that is about the last he remembers of the accident.

John's mother, after hearing a call from her father, hurried to the highway where she found her son in distress. She and the grandfather arranged for John to be taken to the hospital where he was administered to by Dr. Gallivan.

Mrs. Hill testified that she was driving the Cadillac car that was registered in the name of her husband in the direction of Knoxville and in an easterly direction and at the time immediately prior to the time of the accident she was traveling at a rate of speed between 40 and 45 miles an hour in the right lane of the road in the direction she was traveling; that there were vehicles in front of her going in the same direction that she was going

and also vehicles meeting her or traveling in the opposite direction; that the nearest vehicle traveling in the opposite direction was a Studebaker automobile; that she did not see John until he ran from behind this Studebaker car into the path of her automobile and for that reason she did not have time to stop before the left front fender of her car struck John.

This occurred about the center of the highway. When Mrs. Hill saw John she immediately put on her brakes and veered to the left in order to avoid striking him. John was only about five feet away from her when she first saw him. In driving, she did not look to the left of the road but looked straight ahead. Either she or her husband had had the rear brakes of the Cadillac car that she was driving relined about one week before the accident happened.

Mr. Hill corroborates the testimony of his wife as to the rate of her speed and with respect to the green Studebaker automobile that passed her at the time or about the time of the accident. He observed a pick-up truck as it passed the Cadillac car. When he first saw John's shadow he was near the center line in the road, he was running, and could only see him from his waist up. At about the time he saw him, Mrs. Hill applied her brakes which was about the time of the impact.

Under the law, although John Hickey, III was less than 12 years of age at the time of this accident, which was more than a year ago, he is considered an interested witness. Likewise, Mr. and Mrs. Hill are interested witnesses. This does not mean that John and Mr. and Mrs. Hill did not relate the facts surrounding this accident just exactly as they saw them.

There was a disinterested witness who testified in this case as to the circumstances surrounding this accident. She did not know any of the parties involved at the time the accident occurred. This was Mrs. Murphy, who lives in Oak Ridge and who was driving toward Oak Ridge and who saw John Hickey, III when he was hit. She testified that John came from the direction of the field on the north side of the highway and that he was running or trotting in a southwesterly or westerly direction across the highway when struck either in the center of the highway or in the pathway of the highway in which the Hill car was traveling. She stated unequivocally that the Studebaker automobile had passed by the point at which John was located a distance of more than 60 feet. This raises the question why Mrs. Hill did not see him in time either to stop her automobile or pull to the right or the left before her automobile collided with him.

In the opinion of the Court, and the Court finds as a fact, that Mrs. Hill, if she had been looking not only at the center of the road but to the left and to the right of the center of the road, she could have or would have seen John when child-like he was crossing that highway and if she had seen him this unfortunate accident could have been avoided.

The Court, therefore, finds as a matter of fact that Mrs. Hill was guilty of negligence in the respects indicated, and that such negligence was the proximate cause of the accident and resulting injuries.

Was John Hickey, III guilty of proximate negligence which bars a recovery? In the opinion of the Court, and the Court finds, that he was not guilty of proximate negligence that bars a recovery.

This brings us to the question whether he was guilty of remote contributory negligence that would reduce the damages to which he would otherwise be entitled.

John is a bright boy. In the opinion of the Court he is much brighter than the average boy of his age and maturity. The Court observed him carefully while he was on the witness stand and observed him throughout this trial. The Court believes that John at the time of this accident was old enough and did recognize the danger. The Court recognizes that John had his mind on the playing and getting back to his playmates

and, therefore, did not take into account the danger involved in crossing that road.

If John had been an adult, of course he would be precluded from recovery because of his crossing the road under the circumstances existing at the time he crossed it, but we must remember that at the time he crossed it he was a child just under 12 years of age, and he was subject to the usual childish impulses and that children of his age do not recognize danger when danger exists as do adults. See: Breeden v. Hurley, 13 Tenn.App. 599; Bradshaw v. Holt, 200 Tenn. 249, 292 S.W.2d 30; Townsley v. Yellow Cab Co., 145 Tenn. 91, 237 S.W. 58.

Counsel for the defendant has cited the case of Gholston v. Richards, 179 Tenn. 645, 169 S.W.2d 846. In that case the child darted out from behind a bus and the court held that the child's action was the proximate cause of the accident and resulting injuries or death. That is not this case.

Under the testimony of Mrs. Murphy, previously referred to, John was out in the open for a period of several seconds or a long enough period for Mrs. Hill to have seen him, had she been exercising ordinary care.

The final issue is the amount of damages to which John Hickey, III is entitled.

 Doctor Gallivan, an orthopedist, treated and examined plaintiff immediately following the accident on May 18, 1963. Plaintiff sustained fractures of the right tibia and fibula and right forearm. He also sustained an injury to his right knee which gave him more trouble than the sprain to the left knee and left shoulder. He stayed in the hospital until May 25 and was treated at intervals thereafter. Plaintiff's father is a doctor and his mother a registered nurse and this enabled him to get out of the hospital earlier than a person who would have been without medical care in his home. His left knee was put in a brace in October, 1963 and continued in a brace until June, 1964. There is some atrophy in the left knee. The last examination was made this month, which showed deformities of the right arm. There is restriction of motion in rotation, about 30% loss in turning the palm of the hand down and about 10% loss in turning the hand up. There is a deformity of the distal radius. Dr. Gallivan fixed his permanent partial disability to the right arm at 10%, and 5% to the leg, or a combined permanent partial disability of between 7% and 8% to the body as a whole.

The Court fixes the damages at $4,000.-00, in addition to the medical expenses which the defendant insurance company has obligated itself to pay.